# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| 1925 HOOPER LLC; ROBERT J. ARKO; and ANDREW M. MOORE; on behalf of themselves and all others similarly situated, | |
|      Plaintiffs, | |
| v. | CASE NO.: |
| WATSON REALTY CORPORATION, FLORIDA HOMES REALTY & MORTGAGE LLC, PREMIERE PLUS REALTY CO., CHARLES RUTENBERG REALTY, INC., DOWNING-FRYE REALTY, INC, MVP REALTY ASSOCIATES, LLC, SMITH & ASSOCIATES REAL ESTATE, LLC, and MICHAEL SAUNDERS & COMPANY. | CLASS ACTION |
|      Defendants. | |

## CLASS ACTION COMPLAINT

COME NOW, Plaintiffs 1925 Hooper, LLC, Robert J. Arko, and Andrew M. Moore ("**Plaintiffs**"), by and through their undersigned counsel, and hereby submit this Class Action Complaint on behalf of themselves and on behalf of the plaintiff class (the "**Class**") consisting of all persons who listed properties on any Multiple Listing Service anywhere in the United States (the "**MLSs**") and incurred a buyer-broker commission in connection with the sale transaction during the period from at least April 18, 2020 through and including the present date (the "**Class Period**"). This action is brought against

1

Defendants named herein, real estate broker franchisors with a substantial presence in the state of Florida (the "**Defendants**").

## NATURE OF THE CASE

1.    This case involves a nationwide conspiracy by and between the National Association of Realtors ("**NAR**") and residential real estate brokerages orchestrated to increase broker compensation at the expense of home sellers, including the Plaintiffs in this action, by requiring home sellers to shoulder both the commission of their listing agents and the commission of the buyer's agent when properties are listed on the ubiquitous MLSs

2.    An MLS functions as a repository of real estate offerings within a designated geographic area and requires all member brokers to list their properties in this centralized ledger. This ensures that MLSs are at the center of real estate transactions in the United States.

3.    To list a property in an MLS, seller brokers are required to agree to comply with the NAR rules. During the Class Period, the NAR rules, including the "Mandatory Offer of Compensation Rule" (the "**Compensation Rule**"), dictated the conduct of state NAR associations, brokers, and agents.

4.    The NAR's Compensation Rule compelled home sellers to set the commission of the buyer's agent. By enforcing this mandate, the NAR established an anticompetitive market where sellers were coerced into subsidizing the buyer's costs.

5.     The Defendants advanced the conspiracy by annually ratifying the NAR rules, including the Compensation Rule, and by participating in councils and committees that ensured compliance with the NAR rules.

6.     As a result of this scheme, the purportedly non-negotiable commissions of buyer agents were rolled into the sale price of homes.  This system, with its veiled surcharges, illegally warped the real estate market.

7.     By comparison, in foreign markets—such as the United Kingdom, Germany, Israel, Australia, and New Zealand, which are unencumbered by any analogue to the Compensation Rule—the buyer-brokerage fees fall upon the buyer, not the seller. This results in total commission rates that hover between 1% and 4%. This stands in sharp contrast with the United States, where the average total commission rates are in the range of 5% to 6%.[1]

8.     Defendants' scheme artificially and anticompetitively maintained commissions of buyer brokers ranging from 2.5% to 3.0% over many years.

9.     The commission overcharges levied upon home sellers had no correlation to the volume or caliber of services provided, much less any purported value conferred by the buyer brokers who receive the commissions.

---

[1] FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

10. Furthermore, a practice known as "steering," which stems from Defendants' anticompetitive conspiracy, arose from the seller brokers' obligation to extend blanket, non-negotiable commission offers to buyer brokers, a detail visible within the MLS system to realtors yet obscured from consumer view. Steering incentivized buyer brokers to guide their clients towards properties where they would receive higher commissions, curtailing competition.[2]

11. Moreover, given the reluctance of buyer brokers to showcase properties where the commission offered by the seller broker were less lucrative, seller brokers were coerced into proposing high commissions to attract buyer brokers, commissions that would be paid by the seller brokers' clients.

12. In essence, the conspiracy (a) obliged sellers to bear excessive costs for services rendered by buyer brokers to the seller's opponent; (b) artificially inflated buyer brokers' compensation; and (c) promoted and abetted "steering" and similar practices that thwart innovation and stifle competition.

13. As a direct result of this conspiracy, Plaintiffs and their fellow Class members suffered millions of dollars in overcharges and damages.

14. Upon information and belief, the Justice Department lodged a complaint in 2020 against the NAR accusing it of anticompetitive practices.

---

[2] See FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

15.   In one recent Missouri class action, a federal jury reached a verdict holding the NAR along with some of the nation's biggest real estate brokerages (but not the Defendants) liable for almost $1.8 billion in damages for artificially inflating commissions.

16.   Plaintiffs now bring this lawsuit not only for themselves but also on behalf of all sellers nationwide who have been harmed by the NAR's anticompetitive collusion and the brokerages that dutifully toe the line.

17.   Plaintiffs further bring this lawsuit as a class action representing the collective interests of home sellers who, over the past four years, have been saddled with broker commissions while selling residential real estate.

## JURISDICTION, VENUE AND PARTIES

18.   This court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 4 because the suit raises a federal question and "aris[es] under [an] Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

19.   This Court has personal jurisdiction over Defendants because it has: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in

5

furtherance of their unlawful scheme in the United States, including in this District.

20. The Defendants, as set forth in this Complaint, engage in significant business activities within this District. For example, Defendants play a role in a major portion of residential real estate listings and sales within the MLS in this District. Defendants have accrued millions of dollars in revenue originating from business activities in this District, attributable to the brokerage operations of their respective subsidiaries, franchisees, and affiliates operating in this District.

21. Venue is proper in the Middle District of Florida under 15 U.S.C. § 22 and under 28 U.S.C. §1391(b), (c), and (d). The Defendants transacted business, were found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

### A. The Plaintiffs

22. Plaintiff 1925 Hooper LLC ("**Hooper**") is a Georgia limited liability company. In 2022 and 2023, Hooper sold a house located in Georgia, a neighboring state to Florida. In this transaction, Hooper was obligated to pay its seller broker's commission plus the buyer broker's commission of three percent (3%) of the sales price.

23.  Plaintiff Robert Joseph Arko is a Georgia resident. In 2021, Mr. Arko sold a house located in Georgia, a neighboring state to Florida.  In this transaction, Mr. Arko was obligated to pay his seller broker's commission plus the buyer broker's commission of three percent (3%) of the sales price.

24.  Plaintiff Andrew M. Moore is a Georgia resident. In 2022, Mr. Moore sold a house located in Georgia, a neighboring state to Florida.  In this transaction, Mr. Moore was obligated to pay his seller broker's commission plus the buyer broker's commission of three percent (3%) of the sales price.

25.  As set forth in this Complaint, the Defendants' unlawful conduct and conspiratorial collusion have unfairly financially burdened home sellers, including the Plaintiffs, with the requirement that they pay a buyer broker's commission. Moreover, this conduct has not merely imposed an additional cost but has inflated the buyer broker's commission to levels exceeding those that would be dictated by the forces of a competitive market, absent the Compensation Rule and the Defendants' collusion.

### B. The Defendants

26.  Defendant Watson Realty Corporation ("**Watson Realty**") is a Florida Corporation and real estate brokerage with over 1,400 sales associates across Florida and Southeast Georgia. Watson Realty Village may be served with process by service upon its registered agent, 7821 Deercreek Club Road, Suite 200, Jacksonville, FL 32256-3698.

27.  Defendant Florida Homes Realty & Mortgage, LLC ("**Florida Homes Realty**") is a Florida limited liability company and real estate brokerage with over 2,500 agents across Florida. Florida Homes Realty may be served with process by service upon its registered agent, James V. Angelo, 9191 RG Skinner Pkwy #102, Jacksonville, FL 32256.

28.  Defendant Premiere Plus Realty Co. ("**Premiere Plus Realty**") is a Florida corporation and real estate brokerage with over $2.9 billion in annual sales and over 1,500 agents. Premiere Plus Realty may be served with process by service upon its registered agent, Goede, DeBoest & Cross, PLLC, 6609 Willow Park Drive, Second Floor, Naples, FL 34109.

29.  Defendant Charles Rutenberg Realty, Inc. ("**Charles Rutenberg Realty**") is a Florida corporation and real estate brokerage based out of Tampa. Charles Rutenberg Realty may be served with process by service upon its registered agent, Michael Glenn Webb, 1545 S. Belcher Road, Clearwater, FL 33764.

30.  Defendant Downing-Frye Realty, Inc. ("**Downing-Frye Realty**") is a Florida corporation and real estate brokerage that has ranked in the top 100 real estate offices in the country in sales volume. Downing-Frye Realty may be served with process by service upon its registered agent, David E. Frye, 8950 Fontana Del Sol Way – Ste 100, Naples, FL 34109.

31. Defendant MVP Realty Associates, LLC ("**MVP Realty**") is a Florida limited liability company and real estate brokerage with over 1,200 realtors and 22 branch office throughout Florida. MVP Realty may be served with process by service upon its registered agent, Derek Carlson, 1495 Pine Ridge Road #1, Naples, FL 34109.

32. Defendant Smith & Associates Real Estate, LLC ("**Smith & Associates**") is a Florida limited liability company and real estate brokerage with over 250 associates in offices in Tampa, Largo, and St. Petersburg. Smith & Associates may be served with process by service upon its registered agent, Neal A. Sivyer, 401 E. Jackson Street, Suite 2225, Tampa, FL 33602.

33. Defendant **Michael Saunders & Company** is a Florida corporation and real estate brokerage with over 24 offices in Florida. Michael Saunders & Company may be served with process by service upon its registered agent, Paula Rees, 1605 Main Street, Suite 400, Sarasota, FL 34236.

34. Defendants maintain a considerable presence within the markets of Florida, particularly in this District. They hold membership within the MLSs that constitute the Florida real estate market and engage in substantial business transactions within this District.

## C. The Co-Conspirators and Agents

35. Beyond the Defendants specifically named, there exist several other large, national brokerages with extensive business operations throughout the

country. This includes their brokerage subsidiaries, franchisees, and/or affiliates, which together play a significant role in a considerable portion of residential real estate listings within the MLSs that make up this nation's real estate market. These entities also contribute to a substantial number of home sales listed in this District through Florida's MLSs.

36.  These brokerages also hold memberships in the NAR, as well as its state and/or local affiliates. They contribute to and execute the conspiracy by taking active roles on various boards and committees. In these capacities, they enforce adherence to NAR's rules, employing a range of incentives and penalties – metaphorically, "carrots and sticks" – to ensure compliance.

37.  The co-conspirators have accrued millions of dollars in revenue from their business transactions within Florida, and particularly within this District. Their income is directly attributable to the brokerage operations conducted by their respective subsidiaries, franchisees, and/or affiliates.

38.  The Compensation Rule, along with a cadre of other anticompetitive NAR rules, have been implemented by Defendants and their co-conspirators in interstate commerce, including in this District.

39.  Moreover, the franchisees and brokers affiliated with the Defendants have assented to, adhered to, and enacted the Compensation Rule within the geographic areas governed by the MLSs. Through these actions, they have engaged as co-conspirators in the antitrust violations and unfair practices as set

forth herein, performing acts and making statements that further these allegations.

40.  The Defendants are jointly and severally accountable for the actions of their co-conspirators, regardless of whether these co-conspirators are explicitly named as Defendants in this Complaint.

## FACTUAL BACKGROUND

### THE BUSINESS OF REALTORS

41.  In most states, state licensing laws govern the representation of sellers and buyers in the real estate market. Central to each brokerage is a real estate broker-in-charge, who bears the responsibility for overseeing the brokerage's brokers and salespersons. These professionals are termed "associated licensees." Upon the departure of any broker or salesperson from their broker-in-charge, the brokerage must immediately notify the real estate commission in its state. Legally, these brokers-in-charge are responsible for the actions and conduct of their associated licensee.

42.  Brokers-in-charge and their associated licensees perform dual roles within the real estate domain. In some transactions, they function as selling or listing brokers for home sales, while in others, they assume the role of buyer brokers.

43.  According to NAR's own data, in 2017, a significant 92% of sellers completed their home sale with the aid of a real estate broker, and similarly,

87% of buyers procured their homes with the assistance of a real estate broker within that same year.

44.  In conventional residential real estate dealings, brokers-in-charge and associated licensees are remunerated through commissions. These commissions are calculated as a percentage of the home's sale price and are disbursed upon closing.

45.  The financial terms for a seller broker's services are detailed in a listing agreement, a contract drawn between the seller and the seller broker. This agreement not only specifies the financial terms of the listing but often ensures the seller broker exclusive marketing rights over the property. Under the Compensation Rule, this agreement set the total commission due to the seller broker from the home seller and additionally prescribed the portion to be allocated to the buyer broker, should another broker be involved in the transaction.

46.  When a buyer elected to engage the services of a broker, a contract was similarly drawn up, which designated the broker as the buyer's agent. Commonly, this contract provided that the buyer's broker will obtain compensation in the form of a commission, which was typically derived from the proceeds paid to the seller's broker.

47.  If the buyer was represented by a broker, as is usually the case, the seller broker disbursed a portion of the commission received from the seller to the buyer broker upon the completion of the sale of a property.

48.  As a consequence of these contracts and the NAR's mandatory imposition of the Compensation Rule, buyer brokers were compensated from the aggregate commission paid by the seller at closing, rather than directly from the buyer whom they represented.

49.  Indeed, prior to a January 2022 amendment, a stipulated norm within the NAR's Code of Ethics permitted, even encouraged, buyer brokers to inform their clients that their services are offered at no cost – a claim which was untrue and misleading at best. The NAR's 2022 amendment amounted to a tacit admission that its prior practices were untrue and misleading. Upon information and belief, many buyer brokers still inform their clients that their services are provided at no cost, consistent with NAR's original guidance.

50.  This is untrue or misleading because, although the buyer did not directly pay a fee, the cost of the broker's services was inherently included in the overall transaction price and borne by the seller. This means that the broker's compensation was often indirectly paid from the sales price paid by the buyer rather than being an out-of-pocket expense for the buyer. Either way, though, the buyer almost always paid a commission that he or she did not agree to pay and could not negotiate.

51.  In the absence of the Compensation Rule, within a truly competitive marketplace – a context wherein a seller has no inherent motive to fund a buyer broker who is negotiating in opposition to the seller's interests – the financial responsibilities would likely be restructured. Under such conditions, a buyer would be expected to compensate their own broker directly. Concurrently, a seller would agree to a commission exclusively for the benefit of their own broker. Consequently, the total commission a seller would be obligated to pay would be significantly reduced, potentially to half (or even less) of the current sums that cover the remuneration of both the seller's and the buyer's brokers.

## MLS LISTING AND THE COMPENSATION RULE

52.  MLSs are curated repositories of properties available for sale within a specific locale, accessible exclusively to real estate brokers and their agents who are in good standing with the MLS and in compliance with its regulations. The MLSs are under the ownership and operation of local realtor associations, which are not only members of but are also regulated by the NAR.

53.  As mandated by the NAR rules, seller brokers are obligated to list their clients' properties on an MLS. Should a seller broker neglect to list a property on an MLS, most buyer brokers will refrain from showing that property to potential purchasers. Moreover, MLSs serve as the primary fountainhead of property listings for online platforms such as Zillow and Realtor.com, which

have become a pivotal resource for many prospective home buyers in their search for homes.

54.    The Compensation Rule mandated that a seller broker, acting on behalf of the seller, extended a comprehensive, unilateral, and in practice, non-negotiable offer of remuneration to buyer brokers in the act of listing a home on an MLS that was under the purview of a local NAR association. Should the home be purchased by a buyer under the representation of a broker, it was then that the buyer broker earns the compensation as offered.

## NAR'S ANTICOMPETITIVE RULES

55.    The Compensation Rule, established by the NAR in 1996 within its Handbook on Multiple Listing Policy ("**Handbook**"), had been continuously operative until the NAR agreed to promulgate a new rule as part of a March 14, 2024 settlement of nationwide class action claims against it.

56.    Prior to the inception of the Compensation Rule in 1996, the National NAR was instrumental in the creation, execution, and enforcement of a comparable, yet equally misleading and defective, market framework via the MLS system. Within this structure, brokers involved in residential home sales predominantly represented the seller's interests, functioning either directly as the seller's broker or indirectly as a "sub-agent" of the seller's broker.

57.    Within the then-dominant framework of sub-agency, brokers, even those chiefly assisting buyers, were legally bound to uphold the interests of sellers.

Consequently, upon the completion of a transaction, the seller would remit a total commission to their broker, who would then allocate a portion to the "sub-agent" broker. This sub-agent, despite their involvement with the buyer, was under a legal and fiduciary duty to the seller.

58. This convoluted and deceptive market practice led to widespread misconceptions among homebuyers, many of whom erroneously presumed that the sub-agent broker was advocating for them. The revelation of this system, where brokers engaged with buyers were legally compelled to relay information to sellers that could be detrimental to their clients, precipitated its rapid disintegration.

59. When brokers assisting buyers ceased to act as "sub-agents" for the seller's broker, the customary practice of sellers compensating both the seller's and buyer's brokers should have become obsolete, lacking any further rationale for its continuation.

60. Nonetheless, it was at this juncture that the NAR and its co-conspirators intervened, instituting and upholding a restrictive and misleading strategy – a strategy aimed at preserving artificially high commission rates and obstructing more cost-effective and innovative competition.

61. This objective was realized by imposing a directive through the Compensation Rule, which compelled seller brokers to extend standardized,

non-negotiable compensation offers to buyer brokers at the point of listing a property on an MLS.

62. The NAR's Board of Directors, along with its subordinate committees, retains the discretionary power to periodically assess and determine the necessity of modifications to the policies delineated in the NAR Handbook. In accordance with this prerogative, the Board has, in recent years, sanctioned specific amendments pertinent to the MLSs operation.

63. Each policy, be it existing, revised, or novel, is included in the Handbook's annual editions, reflecting a consistent, yearly tradition of update and renewal.

64. Notwithstanding criticisms from economists and industry specialists about the Compensation Rule's anticompetitive nature and its tendency to elevate commission rates above market levels, the NAR Board of Directors persistently chose to uphold this rule in the Handbook.

65. In the process of updating and reissuing the Handbook, the NAR consistently extended an invitation to each of the Defendants and other co-conspirators to partake in the agreement, amalgamation, and conspiracy as set forth in this Complaint.

66. Every conspirator, Defendants included, could only participate in the MLSs across the United States' real estate markets if they agreed to comply with

and enforce the anticompetitive constraints outlined in the Handbook, including the Compensation Rule.

67.   Each conspirator, Defendants among them, invariably and willfully participated in the respective MLSs.

68.   Thus, regardless of their claims of non-authorship of the Handbook, the Compensation Rule, or other anticompetitive rules therein, Defendants nonetheless consented to, adhered to, executed, and enforced these policies, including the Compensation Rule.

69.   NAR characterized an MLS as a "means by which authorized participants make blanket, unilateral compensation offers to other participants."

70.   This declaration implicitly acknowledges the Compensation Rule was a nonnegotiable cornerstone of the MLS system.

71.   The Handbook, on page 65, articulated the Compensation Rule as follows:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants.

72.   Further, page 40 of the Handbook continued with the following:

> Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants

to discuss terms and conditions of possible cooperative relationships.

73. Effectively, the Compensation Rule reallocated a cost to the seller, a burden typically borne by the buyer in a competitive market. In fact, the *Wall Street Journal* recently opined that this practice requires home sellers to engage a buyer broker for MLS listing — a service mandating a seller broker. This system is a "potentially illegal tying arrangement under the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[3]

74. These rules also not only mandated the seller's payment of the buyer-broker's compensation, but they also obscured the compensation structure from buyers and sellers, concealing the true source of the buyer broker's payment.

75. Furthermore, the rules explicitly forbade negotiations over the buyer broker's compensation by either the buyer or the paying seller. Moreover, they precluded a buyer broker from presenting offers to sellers that were predicated on lowering this commission.

76. In response to the conceivable scenario where a buyer aimed to lower their broker's commission as a condition of their purchase offer, the NAR implemented a rule to preclude such arrangements. Particularly, the NAR's Code of Ethics, under Standard Practice 16-16, explicitly stated:

---

[3] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734

> REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[4]

77. The Compensation Rule reallocated a cost to the seller, a cost that, in a competitive market, would typically have been borne directly by the buyer. When combined with Standard Practice 16-16, this rule lacked economic rationality.

78. Moreover, the Compensation Rule initiated a cascade of undisclosed obligations for the home seller. Engaging a seller broker, ostensibly for marketing the property, inadvertently bound the seller to the MLS system, especially if economic viability or benefits like branding and support from Defendants were considerations. This necessitated listing the property on the regional MLS, regardless of the seller's preference. Consequently, this compelled the seller to commit to a unilateral compensation offer to an undefined buyer broker, thereby linking the seller's choice of a seller broker to an unknown buyer broker within that MLS region.

79. The NAR's mandate for seller brokers to propose a blanket, unilateral offer incentivized them to attract buyer brokers with substantial commissions.

---

[4] National Association of Realtors, Code of Ethics and Standard of Practice (Jan. 1, 2023), *available at* https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/2023-code-of-ethics-standards-of-practice

Moreover, the interchangeable roles of brokers as seller and buyer agents in various transactions further reinforced the anti-competitive nature of the Compensation Rule. This rule cultivated a cooperative rather than competitive broker environment, focusing on commission splitting rather than earning client business through quality of service to sellers and buyers.

### NAR's Regulation and Implementation of Anticompetitive Policies

80.  The NAR effectively ensured compliance with its anticompetitive rules and other directives in the Handbook and Code of Ethics among its members. This included state and local realtor associations within the MLSs, as well as non-member brokers and agents in regions served by local realtor association-operated MLSs.

81.  The NAR required its member-owned and operated MLSs to adhere to the imperative clauses in the Handbook and the Code of Ethics. The Handbook specified that an association's accord to form an MLS must encompass the "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing services(s) to operate in compliance with the multiple listing policies of the National Association."[5]

82.  Each MLS, owned by local realtor associations, was subject to NAR's requirement for vigilant monitoring to guarantee compliance with the NAR Handbook. Consequently, every local realtor association, MLS, and their

---

[5] NAR Handbook, at p. 9.

participants consent to the anticompetitive restrictions at the heart of this lawsuit, playing pivotal roles in the execution and reinforcement of these constraints.

83. Non-compliance with the Code of Ethics could result in the expulsion of both individual and associational members from NAR. Specifically, NAR's Code of Ethics and Arbitration Manual stated:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association.[6]

84. Likewise, the Handbook further stated:

> Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation.[7]

85. The NAR's model rules obligated local realtor and brokerage associations within the MLSs of Florida, and particularly this District, to comply with the NAR Code of Ethics or face the consequences set forth above, among others.

86. The NAR scrutinized the governing documents of its local realtor associations, particularly those in the MLSs, to affirm adherence to NAR

---

[6] National Association of Realtors, Code of Ethics and Arbitration Manual 2019, at 1, *available at* https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf
[7] NAR Handbook, at p. 8.

regulations. These associations were mandated to periodically submit their governing documents to NAR for evaluation to demonstrate compliance.

<h3 style="text-align:center">THE DEFENDANTS' COMPLICITY</h3>

87. Defendants consented to adopt, endorse, execute, and uphold the Compensation Rule through active participation in NAR governance and by mandating adherence to NAR regulations among local real estate associations, as well as their affiliated franchisees, brokers, and employees. Defendants' engagement in an association that prohibited commission competition among associates, coupled with their commitment to these anticompetitive practices, implicates the Defendants in the conspiracy, contributing to its perpetuation and enforcement.

88. Defendants engaged in the conspiracy and consciously committed to a common scheme through at least three primary actions: *(1)* they required their franchisees, and the agents or realtors under them, to adhere to the NAR rules, including the Compensation Rule, for MLS access; *(2)* their executives oversaw the adoption, maintenance, and enforcement of the Compensation Rule within the MLSs; *(3)* they ensured their franchisees swayed local realtor associations to implement and enforce the NAR's rules, including the Compensation Rule, as a prerequisite for property listings in the MLSs.

89. *First*, the Defendants enacted the conspiracy and common scheme by requiring their franchisees, and consequently their agents and realtors, to abide

by the NAR's rules, inclusive of the Compensation Rule. Upon information and belief, franchise agreements between the Defendants and their franchisees stipulate that these franchisees and their agents must: (a) adhere to the NAR's Code of Ethics; (b) become members of and follow the rules of the local realtor association; and (c) engage in the local MLS while complying with its regulations, including the obligatory rules from the NAR Handbook. Each Corporate Defendant is involved in agreements with subsidiaries, franchisees, and/or affiliates located and conducting business in this District.

90. *Second*, Defendants' executives, have been integrally involved in the NAR's management and operation. Upon information and belief, senior executives have held positions on the NAR's governing board of directors, which is responsible for drafting, developing, and promulgating both the NAR's Handbook and its Code of Ethics.

91. *Third*, the Defendants' franchisee executives engaged in the governance of local realtor associations and other associations. Through these positions, they have facilitated the conspiracy's implementation. These executives, along with the local realtor associations, have enforced compliance with the NAR's rules, such as the Compensation Rule, and have instituted standard form contracts to enforce the NAR mandates.

92. In each region served by an MLS, including this District, the Defendants' franchisees have advanced the conspiracy. They have done so by colluding with

24

local realtor associations to enact, adhere to, and uphold NAR's regulations, particularly the Compensation Rule.

## EFFECTS OF THE CONSPIRACY

93.  The Defendants' conspiracy has resulted in the following anticompetitive consequences, among others:

     a.  Home sellers have been compelled to pay commissions to buyer brokers, their negotiation adversaries, significantly elevating the costs of home sales;

     b.  Home sellers have been obligated to offer high buyer broker commissions as an incentive for buyer brokers to showcase their properties to potential clients;

     c.  As a consequence of paying elevated buyer broker commissions, home sellers have incurred inflated overall commission costs;

     d.  Often, those inflated overall commission costs are passed along in the price of the home, which means that home buyers also have to pay some or all of the inflated costs;

     e.  The process of retaining a buyer broker has been decoupled from determining their commission; the home buyer engages the buyer broker, but the commission is set by the seller's agent;

f.  Price competition among brokers for engagement by home buyers, as well as among those vying to sell homes, has been significantly restricted;

g.  Rather than reflecting competitive market values like experience, service level, and local connections, buyer broker compensation is predominantly determined by a property's sale price and the customary percentage commission offered;

h.  The inability of home buyers to compete for purchases by reducing the buyer broker commission has curtailed competition among buyer brokers;

i.  The Defendants and their franchisees have significantly boosted their profits through the receipt of inflated buyer broker commissions and artificially high commission rates overall;

j.  The Defendants, through horizontal price fixing, have purposefully inflated or stabilized broker commission rates;

k.  Home sellers have been coerced into buying services they do not desire — namely, those of an unspecified buyer broker — at the time they seek services they do want, such as a seller broker with access to a local geographic MLS; and

l. Commissions have been extricated from the negotiation process between seller and buyer, transforming into a non-negotiable, take-it-or-leave-it proposition.

94. Plaintiffs recognized no pro-competitive benefits of Defendants' conspiracy, which is manifestly anticompetitive and detrimental to competition. The conspiracy represented an effort to sustain the historical system mandating home sellers to cover the buyer broker's commission.

95. Should Defendants contend that the MLS system intrinsically offers pro-competitive advantages, none of these benefits originated from NAR's anticompetitive rules and regulations, which were designed to preserve buyer brokers' inflated commissions. Even if certain purported pro-competitive effects existed, they were significantly overshadowed by the overwhelming anticompetitive impacts of the conspiracy.

96. Considerable economic data corroborate the view that Defendants' conspiracy culminated in elevated total and buyer broker commissions charged to home sellers, surpassing those in comparable markets unaffected by NAR's anticompetitive policies.

97. In comparison with other nations where competitive markets for residential real estate brokerage services exist, the commissions in this country are markedly higher.

98. For example, economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States concluding:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . In the UK, the [total] commission rates average less than 2% . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[8]

99. Delcoure's and Miller's research also revealed intriguing within-country variations. In the UK, they observed that broker commissions typically hover around 1%-2%. However, in highly competitive regions, these rates dip to between 0.5-0.75%, contrasting sharply with less expensive areas where they can escalate to as high as 3.5%.[9] Drawing on global data, these economists ultimately posited that the total US residential brokerage fees ought to align more closely with a 3.0% standard.[10]

100. This analysis contrasts total broker commissions in the regions served by an MLS, averaging between 5% and 6%. Notably, commissions for buyer brokers alone remain consistent, ranging from 2.5% to 3%. These figures have held steady despite fluctuations in home prices, which typically would increase

---

[8] *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).
[9] *Id.* at 17.
[10] *Id.* at 13.

commission amounts, and despite the diminishing role of buyer brokers in a digital era where prospective buyers increasingly utilize platforms like Zillow or Realtor.com for market research. Intriguingly, evidence suggests that this trend of stability in buyer broker commissions is not isolated.

101. Other economists echo these findings. A notable example is a Cornell University Economics Professor, who critically views the NAR's Compensation Rule. The professor labels this a "structural hurdle," impeding innovation and price competition in the real estate sector. According to this perspective, such a hurdle arises not from inherent structural characteristics of real estate markets, but rather because of the alleged anticompetitive conspiracy.[11]

102. The Compensation Rule not only facilitated but also encouraged anticompetitive behavior, specifically the "steering" away from brokers who depart from "standard" commission practices and rates. This rule played a pivotal role in enabling buyer brokers to effortlessly identify and compare the compensation offered by every seller within a local real estate market. Consequently, this facilitated the steering of clients towards homes offering higher commissions.

---

[11] *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

103. The practice of steering actively discouraged reductions from the "standard" commission rate and permitted brokers to sidestep or even penalize buyer brokers who attempted to compete through offering discounts. This practice not only hampered competition but also fostered significant agency costs. It created a misalignment between the incentives of the buyer brokers and the best interests of their clients. Essentially, buyer brokers were incentivized to direct their clients towards properties offering higher commissions, rather than those that best meet the clients' needs or preferences, leading to a conflict of interest. This misalignment undermined the principle of buyer brokers acting in the best interest of their clients, a foundational aspect of their professional duty.

104. The Defendants, along with their franchisees, brokers, and purported co-conspirators, also employed software to strategically direct transactions based on MLS commission data, reinforcing the practice of steering. Additionally, they deliberately limited buyer awareness of properties linked to reduced buyer broker commissions, effectively constraining market transparency and buyer choice. This dual approach – technologically aided steering and selective information disclosure – epitomized a calculated effort to maintain higher commission standards, echoing broader anticompetitive concerns within the real estate sector.

105. CoreLogic, a company specializing in software technology and data services, caters to numerous MLSs across the United States. CoreLogic's primary software offering is known as Matrix.

106. Matrix includes a feature enabling brokers to filter property listings based on the buyer broker commission offered. This functionality allows buyer brokers to use Matrix to selectively present their clients with information about potential homes, specifically those offering a buyer broker commission within a preferred range.

107. Moreover, the NAR implemented various rules and policies, collaboratively drafted and subsequently adhered to by Defendants, which intensify the anticompetitive impact of steering. These stipulations particularly governed how the offered buyer broker commission was displayed, ensuring its visibility and comparability among realtor participants.

108. Defendants ensured that realtors could readily access information about buyer broker commission offers, while ordinary home buyers and sellers remained uninformed of such details. Additionally, the NAR explicitly forbade the dissemination of this information through third-party websites or other MLS syndication services.

109. The NAR and Defendants orchestrated a one-way flow of price information by requiring its disclosure among realtor participants while prohibiting its access to buyers and sellers. This strategic management of

information hindered price competition that could favor consumers and instead encouraged realtor participants to collaborate in maximizing their total commission.

110. Moreover, the concealment of pricing details enabled realtors, including the Defendants who were intent on maintaining the status quo, to penalize brokers and realtors who deviate from the "standard" commission rates without consequence.

111. Furthermore, the lack of access for home sellers and buyers to the comprehensive, unilateral offer of buyer broker compensation deprived them of the means to identify any steering practices by buyer brokers.

112. The economic evidence plainly indicates that the Compensation Rule restricted competition in various aspects of the real estate market, consequently leading to home sellers paying significantly more than they otherwise would in a more competitive environment.

113. The Defendants' conspiracy, along with the Compensation Rule, was strategically formulated to maintain real estate commissions at artificially high, above-market levels. Despite considerable social and technological advancements that typically would have reduced these costs, the Defendants successfully kept the "standard" commission rate at 6%.

114. Furthermore, Defendants' conspiracy and the Compensation Rule were designed not only to maintain elevated commission rates but also to sustain real

estate agents who might not be competitive in a more rigorous market environment. The establishment of a "standard" commission insulated buyer brokers from market pressures, consequently allowing inefficient agents to remain in business without the necessity to enhance their competitiveness or exit the market.

115. The Defendants, in conjunction with other major realty firms, exerted substantial influence over the NAR to the extent that they could effectively dictate its policies. This dominance resulted in local real estate agents being presented with "take it or leave it" policies. Non-adherence to these policies placed these agents in a precarious position, often rendering them unable to sustain their business operations.

## DEFENDANTS' LION'S SHARE OF THE MARKET

116. The service market central to these claims is defined by the array of services offered to home buyers and sellers by residential real estate brokers with access to the MLSs. The Defendants' and co-conspirator's control of local MLSs empower them to enforce the Compensation Rule and other restrictive rules from NAR upon Plaintiffs, the Class members and other market actors. In this realm, access to the MLSs is indispensable for brokers to engage in competition and to adequately serve home buyers and sellers within the territories the MLSs cover.

117. Buyers and sellers typically engage with local real estate agents who are members of the local MLS in the area wherein the property intended for purchase or sale is situated.

118. Defendants, in collaboration with their co-conspirators, possess market power in each relevant market, derived from their control of the local MLSs and their predominant share in the local market, particularly in this District.

119. Within the territories governed by the local MLSs, any buyer brokers aspiring to compete outside the Defendants' conspiracy confronted formidable, if not insurmountable, obstacles. Defendants' dominance means that brokers not party to the conspiracy faced the daunting task of either creating an alternative listing service to challenge the conspirators or attempting to compete without any access to a listing service at all.

120. To effectively rival one of the MLSs governed by NAR's rules, an alternative listing service would need to match, or nearly match, the comprehensiveness of the NAR-regulated MLSs. However, brokers and their affiliated realtors or agents, benefiting from elevated buyer broker and total commissions, had little motivation to engage with an alternative service that would yield lower overall commissions, including reduced earnings for both buyer and seller brokers.

121. Moreover, many buyers would have likely hesitated to engage a buyer broker associated with an alternative listing service that necessitated them

34

paying the buyer broker commission directly, especially when other buyer brokers, operating within an MLS governed by NAR's rules, were fully compensated by home sellers.

122. NAR further impeded potential competition by recommending that MLSs engage in non-compete agreements with third-party websites like Zillow and Realtor.com, to prevent these sites from evolving into competitive entities. NAR's checklist of essential elements dictated that any consumer-facing website must pledge not to compete with brokerage firms or MLSs by either obtaining a brokerage license or offering cooperation and compensation akin to an MLS. These non-compete agreements obliged these websites to refrain from using data in ways that mirror the functions of an MLS. Through such advisements, NAR actively encouraged MLSs to take steps that support the conspiracy, aiming to obstruct third-party websites from emerging as potential market challengers.

123. NAR's history of limiting innovation and competition among real estate brokers is evidenced by past actions, including those that prompted the Antitrust Division of the Department of Justice ("DOJ") to file a lawsuit. The DOJ's lawsuit targeted a NAR policy that hindered brokers using internet-based tools to offer enhanced services and reduced costs to consumers. NAR eventually consented to a Final Judgment, agreeing to modify and abandon the contested policy. The DOJ's lawsuit exemplifies NAR's pattern of developing, implementing, and enforcing anticompetitive policies, such as the Compensation

Rule challenged in this case, which suppress innovation and restrict competition, contravening federal law.

124. Furthermore, the history of anticompetitive behavior in the real estate industry traces back to the first half of the 20th century. During this period, realtors adhered to explicit agreements to use set commission percentages in home sale transactions. This practice was eventually deemed an illegal price-fixing arrangement by the United States Supreme Court in *United States v. National Association of Real Estate Boards, et al.*, 339 U.S. 485 (1950).

125. Similarly, in one recent Missouri class action, a federal jury reached a verdict holding the NAR along with some of the nation's biggest real estate brokerages liable for almost $1.8 billion in damages for artificially inflating commissions.

CONTINUOUS ACCRUAL

126. In the four-year period prior to the filing of this Complaint, the Defendants, in concert with realtors and brokers throughout the country, consistently imposed and collected commissions that were artificially high, a direct consequence of a concerted conspiracy. This systematic overcharging, paid by the Plaintiffs and their fellow class members in the course of residential real estate transactions has not only raised concerns of fairness and legality but has also precipitated individual legal claims. Each instance of these inflated commission payments by the Plaintiffs and class members represents a

separate, actionable harm under the law, giving rise to distinct causes of action for each affected transaction.

127. Throughout the four years prior to this Complaint, Defendants, along with their collaborators, have consistently applied and upheld the Compensation Rule and various other restrictive edicts promulgated by the NAR. This enforcement has occurred nationwide, and particularly within this District.

## CLASS ACTION ALLEGATIONS

128. Plaintiffs submit this action on their own behalf, and as a class action pursuant to Fed. R. Civ. Pro. 23 on behalf of the members of the "Class," asserting Count One defined herein as:

> All persons who, for the period April 18, 2020 through the present, engaged a listing broker affiliated with any Defendants in the sale of a residential property listed anywhere in the United States of America and incurred a commission payment to the buyer's broker in connection therewith.

129. The defined Class above specifically excludes the Defendants, along with its officers, directors, and employees. Entities in which any Defendant holds a controlling interest, as well as any affiliates, legal representatives, heirs, or assigns of the Defendants, are also not included. Furthermore, this exclusion extends to any judicial officer overseeing this case, along with their immediate family members and judicial staff, the jurors involved, and the counsel

representing the Plaintiffs, including the employees of their respective law firms.

130. The Class is readily ascertainable because residential real estate transactions are meticulously documented, and relevant records should exist in the public domain.

131. The number of Class members is so extensive that joining each individually is not feasible. Given the scope of the trade and commerce implicated, it is the Plaintiffs' belief that the Class encompasses several thousand members. The precise count and identities of these members are presumably known to the Defendants and their co-conspirators.

132. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

133. There are common questions of law and fact that are central to all Class members, and these predominate over any questions relevant only to individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

    a. Whether Defendants, or any of them, engaged in the conspiracy;

    b. Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Class;

c. Whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions in the geographic areas where the Defendants operate;

d. Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits thereof;

e. Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

f. Whether Defendants' conduct was unlawful; and

g. The appropriate class-wide measures of damages.

134. Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants and the relief sought within the Class is common to each member.

135. Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation to represent themselves and the Class. Together, Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

136. A class action is the most effective and equitable method for resolving this dispute. Individual lawsuits by Class members would burden both the Court and the Defendants, potentially leading to inconsistent decisions on the shared

legal and factual questions. Conversely, a class action would consolidate efforts and resources, ensuring consistent outcomes for all similarly situated individuals without compromising fairness or leading to undesirable consequences. Without a class action, it would be impractical for Class members to pursue remedies for the alleged legal violations.

137. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

> a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;
>
> b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or
>
> c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

### ANTITRUST INJURY

138. Defendants' anti-competitive agreements and actions have led to the following consequences, among others discussed above:

    d. Sellers of residential property have been forced to pay inflated costs to sell their homes through forced and nonnegotiable commissions to buyer brokers;

    e. Home sellers have been compelled to establish buyer broker commissions at certain levels as a means to induce buyer brokers to show the sellers' properties to potential buyers;

    f. Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers; and

    g. The Defendants and their franchisees have substantially augmented their profits by a significant margin through the increase of both total and buyer broker commissions.

139. As a consequence of the Defendants' purported violations of antitrust laws, Plaintiffs and the Class members have suffered harm to their businesses or property. This harm is due to the payment of higher total commissions than what would have been paid without the Defendants' anti-competitive conspiracy, thereby leading to incurred damages.

140. Any potential pro-competitive benefits occasioned by Defendants' conspiracy are substantially outweighed by its anti-competitive impacts.

141. Substantial economic data suggests that the Defendants' conspiracy has consequently led to Class members paying buyer-broker commissions and total commissions at levels well above competitive norms.

142. This constitutes a quintessential antitrust injury, precisely the kind that the framers of the antitrust laws intended to penalize and forestall.

## CLAIM FOR RELIEF

### COUNT ONE
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15, U.S.C. § 1
### AGAINST ALL DEFENDANTS

143. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 142 of this Complaint as though fully stated herein.

144. From over four years prior to the filing of this Complaint, and persisting to this day, the Defendants have been actively involved in a continuous contract, combination, or conspiracy, egregiously restraining interstate trade and commerce. This conduct violates Section 1 of the Sherman Act, codified at 15 U.S.C § 1.

145. The conspiracy alleged herein is rooted in an enduring accord among the Defendants and their cohorts, compelling sellers of residential properties to pay exorbitant commissions to the buyer broker, a clear transgression of straightforward legal principles.

146. In furtherance of the contract, combination, or conspiracy, Defendants and their collaborators performed one or more of the following overt acts:

h. Engaged in the creation, perpetuation, reissuance, and enactment of the Compensation Rule along with other anti-competitive regulations established by the NAR;

i. Imposed a mandate on the franchisees of the Defendants, among others, to enforce the Compensation Rule and additional anti-competitive regulations set by the NAR. This enforcement was carried out by each Corporate Defendants through its franchise agreements, policy manuals, and other contractual arrangements with its franchisees, affiliates, subsidiaries, and realtors.

147. The Defendants' conspiracy coerced sellers into compensating buyer brokers with inflated commissions, both for the buyer broker and in total, stifling price competition among buyer brokers. The detriment to competition from this scheme substantially outweighs any conceivable competitive advantages that might be claimed to arise from it.

148. Defendants' conspiracy constitutes a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

149. Alternatively, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

150. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other

Class members have been injured in their business and property, suffering damages therefrom in an amount to be proven at trial.

151. Plaintiffs and the other Class members are also suffering a significant threat of injury from Defendants' impending and continuing violation of the antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered in their favor against Defendants as follows:

(a) An Order certifying the Class under Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Class;

(b) A declaration that the Defendants' actions are unlawful;

(c) A permanent injunction enjoining Defendants from (1) requiring that sellers pay buyer brokers, (2) continuing to restrict competition among buyer brokers and seller brokers, and (3) engaging in any other unlawful conduct;

(d) Any other appropriate injunctive and equitable relief;

(e) An award to Plaintiffs and the other members of the Class for damages and/or restitution in an amount to be determined at trial;

(f) An award of exemplary damages in an amount sufficient to punish Defendants and deter future illegal activity;

(g) An award of pre- and post-judgment interest to Plaintiffs;

(h) An award to Plaintiffs for attorneys' fees, expenses, and costs,

(i) Any other award and further relief as the Court deems just and proper.

Respectfully submitted this the 18th day of April, 2024.

*/s/ Nathan D. Chapman*
Nathan D. Chapman
Florida Bar No. 028873

KABAT, CHAPMAN, & OZMER LLP
171 17th Street NW, Suite 1550
Atlanta, GA 30363
Direct: (404) 400-7303
Main: (404) 400-7300
nchapman@kcozlaw.com

Bryan M. Knight*
Georgia Bar No. 142401
Jonathan M. Palmer*
Georgia Bar No. 453452

KNIGHT PALMER, LLC
One Midtown Plaza
1360 Peachtree Street, Suite 1201
Atlanta, Georgia 30309
P: (404) 228-4822
F: (404) 228-4821
bknight@knightpalmerlaw.com
jpalmer@knightpalmerlaw.com

*Counsel for Plaintiffs*
